Do you have a time agreement? Yes, we do. Good morning, Your Honor. I'm John Weston, peering for the appellant, Tim Lyons. In connection with this matter, I will address only the First Amendment issues, and Mr. Kopenny will handle all of these. I'm going to wait just one minute until she gets set up. Are you ready? Okay. I beg your pardon. I was simply trying to address the housekeeping aspects of it. I was the one who got you to jump in. Thank you, Judge Thomas. So you're going to address the First Amendment issues? Yes, and Mr. Kopenny will address the others. With respect to time, if the Court please, we would request the Court's indulgence at this 11th, 11th hour, perhaps giving us a bit more time than the 20 that are allotted, given the number of issues and so forth, to the extent that the Court is inclined to give us an extra five or six minutes, that would be wonderful. Well, let's get to it then. The division of the time would be, in the absence of any extension, 10 minutes for me, 6 minutes for Mr. Kopenny on his opening remarks, and both of us would reserve 2 minutes each then. Very good. Go ahead. Thank you. Tim Lyons is serving a 15-year sentence for fraud based on a trial which, in our judgment, was fraught with error, including significant error of constitutional dimension. He was a fundraiser. He represented small charities pursuant to contracts which provided for contingent compensation of upwards of 80 or 90 percent of the monies that were collected. And most of that 80 or 90 percent was in turn then paid to second and third party subcontractors who performed a great deal of the telemarketing, which was the basis for the fundraising. At trial, by our count, the government on 92 separate occasions referenced either an opening or closing arguments or an examination of witnesses the fact that Mr. Lyons' company's telemarketers did not voluntarily disclose the percentage which the telemarketing company was going to retain of the gathered funds. And additionally, and as part of those 92 references, constantly focused on the fact that the telemarketing companies were going to retain 90 percent of the collected funds. Over and over again. Notwithstanding the fact that these two statements, these two acts of conduct, the non-disclosure, the non-voluntary disclosure of the fundraising arrangements and the high fundraising arrangements themselves have been over and over held by the Supreme Court not to be any necessary evidence of fraud and themselves to be constitutionally protected decisions when made by, for example, charities and their fundraisers. And most importantly, where the evidence of these relationships, the 90 percent retention of collective funds and the non-disclosure of those relationships, except when asked by the donors, that evidence, Your Honor, was not offered in any sense to establish the falsity of any representations made in connection with the fundraising drive. It was simply offered as gratuitous evidence of general fraud. And this was particularly poignant in this case because the evidence against Lyons, who was only the fundraiser here, was circumstantial at best. And this constant mantra, this repetition of this very, very factually devastating in the sense of its impact on a trier of fact evidence came in over and over again. Let me ask you, you know, it kind of boils down on this issue to how we read the Madigan case. And one of the things the Supreme Court said in that case was, so long as the emphasis is on what the fundraisers misleadingly convey and not on percentage limitations on fees per se, such actions need not impermissibly shield protected speech. So I take you at your word that there's 92 separate occasions. I went through the record. I didn't count them quite so precisely. But did you do a corollary analysis of how many times they talked about other misrepresentations that occurred? We didn't with respect to that specific issue. But the primary allegations in the case involved alleged misconduct on the part of the charities. In other words, that the charities didn't spend the monies that they received in ways that were proclaimed that they were going to be spent in the scripts and in the brochures, which had been essentially prepared by the charities and presented to the fundraisers. That was the primary thrust. The secondary thrust of it was that there were statements in the brochures and in the telemarketing scripts with respect to statements about the tax-exempt status of the underlying charities. So those were the two primary bases. Now, to jump to your question, Judge McKeown, about Madigan. Madigan was a very limited case in many respects. Firstly, Madigan itself came to the court only on a motion to dismiss. It never itself evaluated specific statements, evidentiary admissions, and the relationship between an actual factual predicate and evidence that was going to come in. It's unlike this particular case. But more importantly, in Madigan, the allegations which were present before the court were all based on the notion that there had been specific and deliberate misrepresentations as part of the telemarketing to the donors about what percentage of the funds that were given by the donors were going to go directly to the charities. I thought that there were dual misrepresentations, not only about the fees, but that there were other misrepresentations as well. Well, the primary misrepresentations involved, and it's unclear from what the court ---- I mean, it's hard, because on one hand, you tell me that it's just a motion to dismiss, but then you place great significance on kind of slicing the allegations. So I'm ---- Well, it was before the court on a motion to dismiss, where because the complaint itself had alleged fraud generally, and then the manifestations of fraud were the misrepresentations about what the percentages were going to be. There were representations, for example, that 90% of all donations were going to go directly to the charities. There was another series of representations that all of the labor was volunteer, so essentially everything was going to go to the charities. The Supreme Court summarized it by saying that substantial portions, that was a specific representation, substantial portions of the collected fees were going to go directly to the charities, and that there were going to be certain things done with the money, but that was the implication in a sense. The court was saying there was going to be this much money going to the charities, and the charities were then going to be doing those particular things. And in the context of the necessity of disproving the false statements, the court said it would be permissible to allow evidence to come in of the high fundraising costs and the non-voluntary disclosures of those costs to the donors by the fundraisers. But the court reiterated at the end of the opinion, again using the language that Your Honor has referenced, that so long as the emphasis is on what the fundraisers misleadingly convey and not on percentage limitations on solicitors' fees, such actions need not impermissibly chill the protected speech. The point being that the evidence of the high fundraising costs and the non-voluntary disclosure could come in, but to refute specific statements which the government alleged were misrepresentations. Not simply to come in in any case where there were some allegations of either misrepresentation or fraud. It drew the line so that it could only come in to refute specific misrepresentations. Now, why does that make sense? Well, it makes sense because at first blush, the notion of high percentages being retained by fundraisers or high expenses being paid by charities is kind of unsettling. I mean, it's a kind of an unseemly thing as we sort of think about it in the first instance. It's disturbing, but not terribly different in the sense from many other things which the First Amendment protects. But we have to recognize on further reflection that those high fundraising costs are an economic reality because without them, many small charities and organizations simply would not have the ability to generate the funds which allow them either to get started or to continue to stay and do the work that they're doing or to perform those services. But here you had kind of a dual situation where that may be the backdrop, but these brochures and these funds were misrepresented in terms of what was happening. I mean, that seems quite clear. Well, the government has certainly alleged that, and there's other evidence to the contrary. Well, I mean, one person got something, but as a general, this isn't the Red Cross, or maybe I shouldn't use that as an example these days, but, you know, these were unusual charities. Let's put it at that. Well, there certainly was evidence to that effect, but we have to remember that Tim Lyons was the fundraiser here. He wasn't the charity. And to the extent that there were allegations that the charity had misspent monies which the charity received, those allegations were not going to be disproven by pointing out that the cost of fundraising was 90% of the funds gathered. There was no linkage. There was no joining of swords, in a sense. It wasn't either necessary, and frankly, it wasn't even terribly relevant to it. And with respect to the other allegation of misstatements, the 501c3 misrepresentations, as the government alleged, the high cost of fundraising had nothing whatsoever to do with either disproving whether those statements were made, number one, and number two, whether those statements were correct. So it was just, in your view, inflammatory backdrop. Absolutely inflammatory, and for the purpose, particularly with respect to Lyons, given the circumstantial nature of the evidence against him with respect to his knowledge and so forth about what the charities were doing, it became a devastatingly powerful and almost overwhelming and impossible to overcome situation at trial. And again, I think we have to go back to what the Supreme Court's thinking was, both in the pre-Madigan cases and in Madigan, because the Supreme Court recognized, because of this sort of unsettling sense that high percentages and so forth were going to be retained as a necessity for the fundraising efforts, that the court indicated that, A, those percentages were entirely to be within the decision-making power of the charities on the one hand and the fundraisers with which they contracted. And the court noted, there's no indication here that the charities are being browbeaten into doing this. There's no suggestion that the charities don't know what it is that they're doing, or that in some sense they're being coerced here. And secondly, from the perspective of the donors, even Justice Scalia noted repeatedly that the donors are, in today's day and age, certainly understand that they're going to be cost-associated with fundraising, and that if a dollar is given, that doesn't mean that a dollar is in any sense going to go directly to the charity. And if they have questions, they'll ask. And so the court recognized that in order to protect the First Amendment rights, the speech rights of both the charities and the associated fundraisers, it was necessary to draw these protective curtains around those inquiries. And the court was very, very careful with respect to those particular issues, making clear that, A, fraud actions could be brought, of course, and, B, the states could require certain kinds of disclosures that would provide the information, but not in a way that would interfere with the specific and individual expressive rights, both of the charities and their fundraisers, and add a stifling and chilling effect on the fundraising process itself. And one thing that we haven't talked about and really hasn't been addressed previously here is that in connection with these First Amendment issues, the hallmark, the overarching theme of Supreme Court jurisprudence with respect to expressive matters has always been that sensitive tools must be utilized to separate the protected from the unprotected. And that further suggests the fact that in Madigan, the court did not intend to declare open season on the ability of government to utilize the high fundraising costs or the nondisclosure of the facts of those costs in connection with any allegation of potential misconduct in connection with fundraising. Because what that would have done is exactly what the Madigan court said could not be done, and that is to allow the government on a case-by-case basis to retake ground which the Supreme Court has previously declared off-limits. And that's exactly what seems to us occurred here in this trial. The allegations of misconduct that were unique to this case were misrepresentations, so the government alleged, of two particular approaches which were set forth in the brochures and in the scripts. One, as I've indicated before, was the assertion of the tax deductible status of the charities. And secondly, was what the charities were going to be doing with the funds that were received. And as to neither of those allegations, the facts of the high fundraising costs or the non-voluntary disclosure of those costs was remotely relevant. They shouldn't have been admissible, they shouldn't have been utilized, and certainly the fact that the government used them over and over and over again, as we point out in our briefs, was inappropriate at least,  when coupled with the jury instruction that allowed the trier of fact to utilize the high cost of fundraising and the non-voluntary disclosure of the fact of high costs. So that's right out of Madigan, though. I beg your pardon? Your instruction was right out of Madigan. Well, not quite. The jury instruction was out of Madigan, but taken out of context and I believe misunderstood. Well, perhaps, but I mean it was a verbatim. It was verbatim, but again, Your Honor, as I indicated before, Madigan was not a case reviewing evidence. It wasn't a case reviewing a trial, it simply was a case which stood for the proposition that the only thing that it did was to permit a complaint to go forward, which on the face of it alleged misconduct, fraud, which included misrepresentations as to the very issues of what the costs were of fundraising and how was the money going to be utilized. I gave you a little extra time and I think your colleague is getting anxious. I'm grateful. Thank you, Your Honor. May it please the Court, I didn't realize my anxiety was showing. I'd like to follow up if I can. It wouldn't be the first person. It never fails at whoever stands up first. The second person is like waiting. Thank you. I'd like to address actually all three of the questions that I made notes of before I go on to the remarks that I intended to start with. First, Your Honor, Judge McEwen, you asked about Madigan and Judge Thomas, you said, well, the instruction was right out of Madigan. In our reply brief, we pointed out that the government seems to be saying that Madigan in some ways expanded their ability to prosecute for fraud in an area that might previously have been protected by the First Amendment jurisprudence of the Supreme Court. We pointed out that when case law expands the interpretation of a statute, a criminal statute, that it cannot be, without filing a due process, applied retroactively to events that occurred prior to the decision. And Madigan was decided after the events alleged in the indictment in this case. I'd just invite your attention to that brief discussion on page 13 of Mr. Sancher's reply brief. The other point I would like to make is that Judge Thomas, you said that the instruction is right out of Madigan. However, Madigan was not talking about jury instructions in a criminal case. I understand that. District court judges get awfully upset with us when we say you didn't follow a case and they say we quoted from the case. I take your points on that. Don't worry about it. I understand. And the reason I'm emphasizing it is only because it really leads into one of the criminal law issues, which is not really a First Amendment issue that I wanted to talk about, and that is this question of whether the co-schemer liability instructions were proper. The government tends to argue that the reason the co-schemer liability instructions were proper in this case, and I've covered a lot of the government sub-issues in my brief, and I'm aware of the small amount of time I have here, is that the case law equates, during the course of the scheme, with foreseeability. We've complained that this jury was not told that to be liable as co-schemers for acts of someone else, and in particular the uncharged and not proven beyond a reasonable doubt to be guilty telemarketers, that the jury must be instructed that their criminal acts were foreseeable by the charged defendants. The government cites several cases saying foreseeability is equivalent to in the course of the scheme, and that this jury was told that the acts of the other people for which the defendants are going to be held liable have to be found to be in the course of that fraudulent scheme. I would point out, and I would ask, just invite the court's attention to my discussion in the appellant's opening brief of the Stapleton case, where Stapleton is quoted by the Turalo case, which is the lead case we rely on for our co-schemer argument. Stapleton says that the jury must be instructed that the acts in the course of the scheme, that the defendant can be held liable for them so long as they are foreseeable by the defendant. In our case, that language was missing from the instruction. There was no requirement that our jury find those acts to be foreseeable. And I take it that this is another example of how the appellants would argue that there's a difference between a correct statement of law and a correct jury instruction. Because it might very well be that when the issue is sufficiency of the evidence, that a court can find that the defendant can be legally held responsible for the conduct of a co-defendant or an uncharged co-defendant who is an alleged co-schemer. It's not to say that it's a proper jury instruction to tell the jury that they may convict in the absence of a requirement that they find that foreseeability element, which is different. And if we agreed with you, because you are now quoting out of Stapleton, I think. I'm quoting Turalo, quoting out of Stapleton. Quoting out of Stapleton. Yes, Your Honor. So that's the genesis of the foreseeability language. Yes, Your Honor. So you may well be correct, I think, on the proper wording of an instruction. But the question is what effect, given this evidence, given the standard of review on a jury instruction. That's the other question of yours that I want to address. And that is the given this evidence implication in the question that you asked counsel and the question that you've just asked me. It isn't anywhere nearly as clear as Your Honor's question suggests that the government made a strong showing even that the monies that were collected were not used for charity. What the government did, and I've covered this somewhat in my brief, is put in anecdotal evidence from people who were workers at the charity for various times, which did not cover even the entire period, saying when I was there I didn't see a lot of charity acts. The government didn't prove what wasn't done here. The government simply put on a summary expert to say very little money was spent on charity. But if we look at the numbers here, we're talking about $7 million roughly. 90% of that went to telemarketing. The other 10% would be $700 and some thousand dollars. The government conceded to the jury, and must concede on this record, that $600,000 that was collected is totally unaccounted for because the bank lost the records. In addition, there was $137,000 left by my client in the bank account when it was passed on to, when this charity was taken over by another person. That's over $700,000. For the government to say, or for Your Honor to conclude that on this record, the party with the burden of proof proved that the money that didn't go to the fundraising costs of telemarketing was in fact not spent on charity, I think is wrong. I think there's an utter failure of evidence on that. Besides that, we have a lot of anecdotal evidence that some money was spent on charity. So I think what- Do you think the anecdotes kind of cross each other out? No, I don't think it's possible when one party bears the burden of proof for anecdotes to cross each other out. And anyway, these were anecdotes on the basis of witnesses who the government did not prove had a basis for knowing. In other words, they had these three young women who worked in the charities at various times saying, I didn't see any charitable acts or I saw very few. But they didn't prove that if charitable acts were being performed by the charities, that these people were in a position to know whether they were being done or not. They just said they didn't- But what about the expert report? What can be made of that in terms of- Do you mean the summary witness who talked about the money? Right, about the money. That's just the location of the money in the- Well, again, I would point out that $600,000 was not in the calculations that that expert used. And we know that 90% of this money went to telemarketing. If that's constitutionally allowed, then we're talking about accounting for $700,000 over this period of time. And $600,000 was utterly unaccounted for. This summary witness said he didn't see evidence of a lot of money spent on charity. But there's no evidence about how that $600,000 was spent because there were no records for it. So I think that that is- I mean, the government made a lot of it in the argument but didn't really prove that no money was spent on charity or even that not much money was spent on charity. I know I'm over time. I'd like to ask for a couple more minutes if I can just to address one other point. And it's something that I expect the government to be talking about and that's why. This question of whether- and, Your Honor, Judge McHugh, you asked about the other misrepresentations that were alleged. I'm very concerned and I hope the Court is able to address the question of what happens when a church takes out papers and incorporates as a church entity under state law and then represents the contributions to that church are tax-exempt. Because our analysis of the statutes, the IRS statutes, says that it's automatically entitled to that tax exemption unless and until the IRS gives them notice that they've determined that it's not a church or not entitled to tax-exempt status. The government told the jury in this case that that's not the case. That if you conclude that this is not a sincere church under some standard of what you as the jury can conclude a church ought to be, then you can conclude it's a sham and therefore not entitled to tax exemption. There's no case law cited by the government for that proposition. There's no statutory law cited. And the government's expert, which was quoted, was quoted out of context in their brief. And when asked that direct question on cross-examination, he admitted that that is what the statute says. What the government's IRS agent said to the jury was, well, after the fact here, well after the time that the indictment is concluded, I'm conducting an analysis based on 15 criteria that the IRS published later after these events occurred. And based on those criteria, it's my opinion that this is not a church. And therefore it shouldn't have been tax-exempt. But for the government to say that it proved in any meaningful way that it even offered substantial evidence or sufficient evidence to support a jury's finding that it was a lie to say that these contributions were tax-exempt, I think is a misrepresentation of the record. And that's why we've raised the argument about the jury being instructed on what theories they were allowed to base a conviction on. We have the First Amendment issue, which I'm not addressing just because we've divided the time that way. We have this question of whether it was a lie to say these contributions were tax-exempt, when we – our understanding of the law is that it was in fact the truth, that a church, any church, that is identified as a church entity under State law is automatically tax-exempt under the IRS statutes unless and until there's notice and a contrary finding by the IRS. And neither of – Do you know what this reminds me of a little, which I – No, I don't know. The law is settled, but it reminds me of the reports now of the tax shelters, which have never been found illegal. And they're sort of arguing if they haven't been found illegal, then how can you prosecute them? The reason that this is different, Your Honor, is that the statute itself says that unless the IRS gives notice, it remains exempt under 501c3. In other words, I'm not suggesting that this is just blessed ignorance, you know, that these guys just said, well, until they tell us, we're doing something wrong, we're not. I'm telling you that we've cited the statutes that say if you incorporate as a church, you're entitled to this exempt status unless you get notice. So would – is there any circumstance then, absent the IRS kind of yanking the church status, that would permit a prosecution on that theory? In my view, there's no – there's no circumstance under which a prosecutor can tell a jury that a state-incorporated church entity was not entitled to a tax-exempt status if, under federal law, the person is entitled to assert that until the IRS gives them notice to the contrary. So – and if that's – if that is the only theory of fraud, I think it would be a legally unfounded prosecution under the fraud statute. So just sort of to recap, we've got the IRS question – the First Amendment question about whether or not the theory that not disclosing the amount of fundraising was legally permissible. We have this IRS issue about whether or not it was a lie, and this is a question of law, I think, to say it's tax-exempt when it was a legally incorporated church that was legally soliciting. And then we have this question of how much money was spent on charity, where the government's evidence really fails in terms of proof because the government admits that 90 percent of this money went to telemarketing. And I take it that the First Amendment cases say that's not illegal. And that leaves about 700 and some thousand dollars that was fair game for the government to prove was not spent on charity. But we know where 137,000 of it is, and the other 600 is absolutely unaccounted for. So on the burden of proof, I find it difficult for the government to defend a theory of fraud which is based on – just sort of pick a theory to the jury, which is what the government told the jury. You can just find a scheme to defraud. You don't have to find any particular type of statement to be false and to agree on it. And then use the kind of argument that was used in this case, which was basically an appeal to passion and the emotions of the jury, about what kind of a person my client was and whether he was sincerely a church or really something else, which I think has no place in this kind of a prosecution. What has a place is proof that false statements were actually made. And I don't think any of them really meet – the evidence meets the standard in any of those categories. I know I'm way over time, and I appreciate it. Thank you. No, we gave you some leeway. Can we take a short recess? Sure. We'll take a short recess before hearing the – Thank you. Thank you. Question. Excuse me. I've got this here. Yeah. I have a question. Okay. There are – I have a question. Right. I have a question. Yeah. So – I have a question. I have a question. Can you predict a reasonable – I mean, it's good if it's long-winded, right? I don't know. Do you want me to repeat the question? Okay. I have a question. I have a question. I have a question. Okay. You're welcome. No. I have a question. I have a question. What's your name? Brooklyn. When's your birthday? How old are you? You look very young. Thank you. Where did you go to school? Brooklyn. You went to both? I just keep crying. Thank you. All rise. You're eagerly awaiting your time. We'll give you a little extra time if you need it to. I'm sorry? We'll give you a little extra time. Thank you, Your Honor. I'm losing my hearing and eyesight. I'll try to speak up. Thank you, Your Honor. May it please the Court, my name is Ellen Lindsey. I'm an assistant United States attorney in Los Angeles, and I was trial counsel on this matter. Your Honors, I think it is very clear that in this case, this case really reflects exactly the type of action that was contemplated by the Supreme Court in all of the predecessor cases to Madigan and in Madigan. The case was based on three very specific types of misrepresentations. The first type of misrepresentations is really an echo, as Judge McHugh stated, of one of the allegations from the Madigan case, and that is that the telemarketers represented to potential donors that their money would be spent on charity, when in fact the only charity was very incidental to the for-profit activities of everyone involved. The second, of course, is the brochures themselves, the specific brochures that made promises to donors of the specific ways in which the money would be spent. And reading the defendant's briefs and hearing Mr. Weston argue, I just wonder if it's even a reflection of the same trial that I was at, because really the very strong emphasis and most of what was discussed during the trial were the specific brochures and scripts that were written by the two defendants together and given out and the fact that this is what donors were told. And really ad nauseum and I think to some boredom by the jury going through each brochure with the witnesses, with Kate Flanagan and with Tamara Bell. Let me go back to one statement you made. You said that telemarketers represented that it would be spent on charity but that was only incidental. Yes. And I assume you say that because of the large percentage that went to the fundraisers or because the money that was left over after the fundraising costs wasn't actually spent. Well, it's actually the whole panoply. I think you have to show what is done with all of the money. But it's not the bare allegation of fundraisers' fees. It's the fact, as you state, that of the money that went to the charity, virtually nothing was spent. And in some instances, actually nothing was spent for handy. That's quite a different thing from saying if you're a solicitor calling and say, you know, I'd like you to donate to this and you say, okay, I'll send in my money and it turns out as many of these professional fundraisers do, take the large cut. So they take the 90% cut and then 10% goes to the charity. It's one thing to say well, it's a misrepresentation because so much of it goes to the fees as opposed to the money that does go to charity actually doesn't end up with the charity. So which of those, what was the theory? Well, Your Honor, it was the latter and Why do you need the fundraising costs? Well, I think it's very interesting that Mr. Kopeny argues, and he does in his brief also, that it's not sufficient for the government to put on three employee witnesses and relate their testimony of the fact that no charity was done. The only thing that's going to do it is the cold hard bank records in any fraud case, the question is always how do you prove the misrep of how the money was spent? You show how the money was actually spent. There's simply no way to show how the money was actually spent without showing the whole way that the money was spent, and that includes this much went to this, this much went to this. So you have to show in order to prove the misrep, in order to show where the money went, you must show that some of it went to fundraising, some of it went to Mr. Sanchez's rent, some to his medical expenses, some to his phone bills, some to his scooters that he worked on, but none of it went to the actual charitable activity. And I think it is important, and I hope I emphasize it in my brief, that when I addressed the issue of how the money was spent with the jury, it wasn't to say 90% was spent on fundraising, period. But to say, this is how all of the money that came in was spent. And you can't discuss that without saying how much went to fundraising. But as you state, Your Honor, then what makes it key, what makes it important, and what brings it within Madigan is the fact that beyond that, virtually nothing was spent on the actual charitable activities. But I guess the question is, it's one thing to say, okay, here's the amount of money, everybody agrees that a certain amount was spent on fundraisers, there's nothing illegal about that. And so what we have to do is figure out whether the remaining money went to the charity, whether there were misrepresentations. But their argument is that there was so much emphasis on what would be shocking to most people about how much goes to fundraising, which might be shocking, but it's not illegal, that that tainted. What is your response to that? My response to that is that you can take each instance as in especially Mr. Lyons' brief, is simply there is not really a recitation of facts. It's picking each instance in which that's mentioned out of the record and lining that up as if that's what the government's case was. That was not the government's case. And as Your Honor said, did they compare how many times that was mentioned? I'm not making any decision or saying anything. Oh, no, no, no, I know that. But I'm saying that it is it's frustrating to see the record so distorted. And it really is so distorted by that. The main focus of the testimony was about these brochures and about what was specifically said and then was in fact that money spent that way? No, it wasn't. Did you plan outings to take handicapped children to amusement parks? No, we didn't. Did you provide money for the families of slain police officers? No, we didn't. Did you support AIDS research? No, we didn't. That was ad nauseum, the testimony. And if you're talking about Judge Carter runs a very long day, so although it was two weeks of trial, we went eight hours of testimony each of those trial days. And to pick ninety, I'm taking their word, to pick ninety instances out of eight hours of trial day for two solid weeks, that's not a constant emphasis. And it just wasn't that way. And if your honors read the record, you'll see that that is a distortion of the record. And the only way that they can make their argument is to distort the record in that way. Your honor, when I put the government's first misrepresentation, when I worded it the way I did, I was kind of quoting right out of Madigan, where one of the representations in Madigan is funds donated would go to further charitable purposes when in fact the amount paid over to charity was merely incidental to the fundraising effort conducted primarily for the private pecuniary benefit of the fundraisers. The government's theory goes beyond that because we talk not only about the amount going to charity but then what was done once it went to charity. So that misrepresentation as long as it's coupled with other affirmative misrepresentations was approved of in Madigan over and over. What Madigan requires is specific affirmative misrepresentations about the way the money was spent. And that was the emphasis of the government's prosecution. The brochures and the promises that were made to donors about the way money would be spent that in fact it was not. Speaking about the tax exempt status of the charities, Judge Carter mentioned over and over to the defendants, I know you're going to want a jury instruction about this issue. Draft me a jury instruction. They never did. They specifically stated that they were not going to do that. So they failed to ask the court to give some legal guidance to the jury on this issue. What the government's experts said and what the government emphasized was not whether we liked Mr. Sanchez or his religious ideals but the fact that yes, a church is in fact tax exempt on its face. However, and this is what the expert testified to, it is improper for the church to represent to donors that their donations will absolutely and in fact be tax exempt when you haven't gotten the actual formal exemption from the IRS. So it was not a touchy-feely church question really. It was a specific you didn't seek specific exemption and therefore it is not appropriate to guarantee to the donors that you are in fact tax exempt. This taken in light of the fact and viewing the government's evidence in the light most favorable to the government as Diana Mercurio testified that the defendants got together and very specifically called it a church to avoid the tax issues. And then there's evidence in the record and I think I've pointed that out to your honors that both Lyons and Sanchez would try to use the church as a shield against any kind of law enforcement scrutiny. You can't touch us because we're a church. If I were you I'd be worried about challenging a church because we're sacrosanct just because we say we are. So they were very aware of the fact that they were using this as a shield. One thing that the defendants talk about is that yes, Madigan clearly allows for evidence of the percentages and evidence of the omission. They claim that the only context in which you can use that evidence is if the telemarketers specifically make representations about how much money is going to the donors. I don't think Madigan can be read that way. In reading Madigan they do state that some of the affidavits of donors in that case in those instances there were some specific statements made to the donors regarding the percentage of money. But Madigan nowhere makes that a requirement. What Madigan requires is that the prosecution not be based solely and only on the percentages or the omissions. To say that we are retaking ground that the Madigan court established is completely untrue. Every single one of the cases Riley, Munson, all of them specifically reserve the possibility of individual fraud actions. What is extremely important to the Madigan court is that the government has the burden of proof beyond a reasonable doubt and that there are various elements of fraud that must be met. It's not a broad prophylactic remedy. Was the jury told that simply having high fundraising costs was not illegal? Yes, Your Honor. It wasn't put that way. Was there a jury instruction that would approximate something along those lines? It was a direct quote from Madigan and what it says is and I can find it here if you'd like It is high fundraising costs without more do not establish fraud and mere failure to volunteer the fundraiser's fee when contacting a potential donee without more is insufficient to establish fraud. So the jury was instructed that it could not convict solely on that. I believe I was careful in my closing argument as well Your Honor to point out to the jury that they could not convict based on that. I wanted to make clear that I was not basing my argument on that. I want to just talk about an evidentiary matter that Mr. Kopeny brought up and that's this issue of this $600,000 that nobody knew where that $600,000 went. As Defendant Sanchez conceded it had nothing to do with the government it was bank poor bank records and they were not able to give it to us or to the jury or they were able to give it to us in an illegible form but Mr. Sanchez himself conceded that obviously that money would have been spent consistently with the rest of the money so that you can't say that all $600,000 of it went to charity. Clearly as he said, as he conceded and in the light most  that $600,000 was spent the way the vast majority of the rest of it was spent that we were able to analyze. So in other words 90% of it was not available at all to the charities and of the remaining 10% virtually none of it was spent on charitable activities. To say that there's I just want to address again in case I haven't to say that there's no nexus between the to fundraising costs and the specific misrepresentations made in the brochures is completely incorrect as I said in any fraud case you really have to trace the money. Otherwise you get an argument like the one that's being made in this case that the eyewitness testimony of the people that were right there is simply insufficient to establish the fraud. We had to show where the money went. There's no way to do a fraud case without money tracing. So there was an absolute nexus and that's why it was done. Would your honors like me to address the foreseeability argument? Yes please. I think it's clear that in the cases and I argued the Stapleton case that was from a trial that I did definitely the instruction in that case which is now a pretty much a standard 9th circuit jury instruction. It mentions the foreseeability element. However the cases that discuss the law of foreseeability or excuse me the law of co-scheme reliability do not require foreseeability. What they require is that the defendant be a knowing participant in a scheme to defraud with the intent to defraud and that the act be committed in furtherance of the scheme. So that Judge Carter's instruction did include the necessary elements. But in this case it wouldn't even be necessary to address co-scheme reliability because unlike Teralo these defendants could be found guilty as principals and as aiders and abettors whereas in Teralo they could not have been the only way they could have been found guilty was co-scheme reliability and no instruction had been given in that case at all. Another thing to recall is that the instructions must be taken as a whole and the mail fraud instruction itself requires foreseeability. It's in the actual mail fraud instruction I'm not sure that I have it directly in front of me but it does require that the mailings be made in furtherance and be foreseeable in the ordinary course of business. I think what I would really like to emphasize is that the evidence in this case was simply overwhelming. These two people got together and they plotted a scam in the name of charity in the name of children and veterans and deceased police officers. It was very clear it was very calculated and all of the evidence at trial demonstrated that these two defendants knew precisely what they were doing. These telemarketers know and knew the Riley line of cases they all knew about it and they knew about the tax and they were trying to use these to get around any kind of lawful practice and to simply take as much money from donors as they possibly could while not performing any kind of charitable activity. The evidence was absolutely overwhelming from the employees who worked there from the financial analysis and from the expert testimony that this was nothing but a complete scam and that it fell well within the confines of the Madigan case and if there's nothing further I'll submit. Thank you very much. We'll give you two minutes each for rebuttal. Does that work? May I inquire? Will the court be giving us each two minutes or just together? Each two minutes. Thank you very much. First the government has conceded that the rule of law that we cite about the tax exemption, but then I guess defended the argument in this case that that was a lie because in the government's opinion for a church to be able to tell people that their contributions are tax exempt in other words to inform the people that because we are an incorporated church and under federal law we're entitled to tax exempt status unless the IRS tells us otherwise and they haven't told us that but before you can tell people that you have to formally apply for a formal determination by the IRS of such a status no authority whatsoever has been cited by the government for that proposition and for the government to make the argument in a criminal case where the government is asking this court to say that one of the theories on which a criminal fraud conviction could be upheld is on the government's opinion, which is not supported by any authority in law, that that's what a church should do before it can make a representation to a donor that their donation is tax exempt, I believe is incorrect. It might be fine to say that if later it turns out that the IRS determines that there's not an exempt status, that there might have to be some determination of what taxes erode, but how in the world can the government defend an argument that it is a crime to tell someone that under the law we're a tax exempt organization, when that is the law and the government concedes it. The second thing that I would like to say is that the court should distinguish between that argument and the other argument that the government told you was made during the closing argument to the jury, which is that there is anecdotal evidence that these defendants hid behind the church status. That's clearly fair game. That's a perfectly appropriate argument for the government to make in terms of asking the jury to draw an inference that these defendants were doing something improper or thought they were. But note that every church organization could be accused of hiding behind its church status. We've seen in the history of religious freedom of this country, over and over again, accusations that one church or another or one religious organization or another is throwing up its First Amendment status in order to prevent inquiry by the public or the government. And I take it that the balance that the law strikes there is in favor of providing that protection. So it's a reasonable argument, but it's not the same as saying it's a lie to say tax exempt status. And I would ask the Court to distinguish between those two. Judge McKeon, you asked whether or not the jury was told that without more percentage of fundraising is not sufficient. The prosecutor's response was very telling, I think. The instruction was read by the United States attorney, and what the jury was told was without more, high fundraising costs are not sufficient to establish fraud, and without more, failure to disclose high fundraising costs are not sufficient. But in this case, the argument was both are present. And therefore, the jury was never told that the two of them can't combine to make a fraud case. And I take it that that is incorrect under the First Amendment line of cases, but I think counsel might address that. I'm out of time? Well, I would have said more about foreseeability if I had more. May it please the Court. In Madigan, at the beginning of the opinion, right after the announcement of who was delivering the opinion of the Court, Judge Ginsburg writes, the Attorney General's complaint alleges that the fundraisers defrauded members of the public by falsely representing that a significant amount of each dollar donated would be paid over to the charities. Right in the allegations, that was the primary thrust of what Madigan was all about, in that the fundraisers, pitch, brochures, solicitations, all specifically told their donees, their prospective donors, that significant amounts of the money that they gave would go to the charities. And on that basis, it was appropriate to show that in fact, 90% of the money went to the telemarketers in that case, because it made a lie out of what had been specifically said to the donors. In the same way that the Supreme Court has made clear that if donors ask questions to the telemarketers, how much of my money is going to the charity? The telemarketers are obligated to provide that truthful information. So in your view, should they have simply come in and said, this is the amount of money that was collected to go to charity and it didn't and not say anything about... That's correct, Your Honor, and that's exactly what the First Amendment protects, that there's no obligation for the telemarketers to be compelled to tell how much they are doing, and in fact, the percentages need not be disclosed to the donors. Obviously, they have to be filed at some later time with the government. And the Court notes that if the complaint in Madigan had alleged nothing more than that high fundraising costs were retained by the... high fundraising percentages were retained by the telemarketers or that they failed to voluntarily disclose that fact, the complaint would have to be swiftly dismissed. As Your Honor's question at least was inquiring about, that's insulated from prosecution or condemnation. I would note, and I know I have negative seconds left, that I count five times towards the end of Ms. Lindsay's closing argument in which she notes about the 90% being taken by the telemarketers. Well, we know right off the top that 90% of it went to NAA, Mr. Lyon's organization. And the last point that I would make with respect to this is that the errors to which we have called the Court's attention are errors of constitutional significance. The government was obligated to show under Chapman that those were harmless beyond a reasonable doubt. We respectfully submit that they haven't. The matter must be remanded for a new trial, not inconsistent with that and for purposes, and on the basis of, proper evidence without reference to the fundraising or the failure to non-disclose. Thank you, Counsel. I want to thank all of you for your arguments and presentations. An interesting case, and the arguments today and the briefing have been very helpful. With that, we'll take the case under advisement, and we will be in recess.
judges: Thomas, McKeown, King